660 A.2d 592

**In the Matter of the Insurance Trust of Howard S. SAMSON Dated December 5, 1967 for Elinor R. Samson, et al. (Four Cases)**

**Appeal of Richard C. BEINHAUER. (Four Cases)**

Superior Court of Pennsylvania.

Argued Jan. 26, 1995.

Filed March 28, 1995.

Reargument Denied June 7, 1995.

546

Michael E. Lowenstein, Pittsburgh, for appellant.

John R. McGinley, Pittsburgh, for Stoecklein, participating party.

Templeton Smith, Jr., Pittsburgh, for Trustees, participating party.

Before ROWLEY, P.J., and McEWEN and POPOVICH, JJ.

POPOVICH, Judge:

This case involves an appeal from the orders (consolidated for appeal purposes) of the Court of Common Pleas of Allegheny County, Orphans' Court Division, approving the sale of trust property excepted to by the appellant, Richard C. Beinhauer. We affirm.

The record discloses that on December 5, 1967, Howard S. Samson (settlor) created an "Insurance Trust Agreement"

whereby the trustees [1] were to hold certain policies of insurance on the settlor's life in trust, and the proceeds were made payable to the trustees as beneficiaries. The trustees also had the power to invest assets of the trust and distribute income to the wife (75%) and daughter (25%) on a quarterly basis. The principal could be invaded by the trustees and paid to the wife if deemed advisable. Further, the Trust was to terminate after the passage of 21 years "following the death of the survivor of the [settlor's] wife and all his issue living at his death or until the prior death of all the [settlor's] issue." The remainder interest was transferrable to three charitable organizations.

Article Five (A) of the Trust Agreement reserved to the trustees the power to sell the trust corpus for a price deemed reasonable by the trustees, but in no event was the sale to be made "to any person ... who is a resident of Allegheny or to any corporation doing business in Allegheny County."

With the settlor's death and his wife's advancing years, the trustees decided to sell the real estate held by the Trust and distribute the proceeds to Ms. Samson. After conducting a nationwide search, the trustees located a buyer (appellant) offering a fair price (1.3 million dollars) for the settlor's stocks and real estate holdings. In advance of completing the sale, however, the trustees interpreted Article Five (A)'s geographical exclusion of Allegheny County residents or corporations doing business therein from the sphere of potential purchasers to necessitate court approval of the sale to the appellant, who met the latter exclusionary criterion.

Toward that end, a "Petition For Leave To Consummate Sale" was filed to secure the court's approval to sell to the appellant because of his business activities in Allegheny County. See Paragraph 10. A date was set to hear argument on the appellant's Petition. Prior thereto, however, one Bernard E. Stoecklein objected to the Petition and submitted a bid of 1.4 million dollars.

1. The trustees consisted of Elinor R. Samson, wife of the settlor, Thomas D. Thomson, Esquire, and Mellon National Bank and Trust Co.

By order dated March 11, 1994, the Orphans' Court ruled that the Sales Agreement between the trustees and the appellant was "contingent", and case law authorized it to "evaluate all offers" where a trust sale was pending. Exceptions by the appellant were dismissed, and the March 11th order was rendered final for appeal purposes. The same occurred with regard to the Orphans' Court's April 13th (denial of the appellant's preliminary objections) and May 12th (authorization of oral auction in open court) orders, all of which were consolidated by this Court for appeal purposes.[2]

Initially, we are asked to consider whether the Orphans' Court exceeded its authority in refusing to grant the "Petition for Consummation" of the Sales Agreement between the appellant and the trustees after concluding that the geographical restriction in the Trust Agreement did not apply to preclude the sale to the appellant.

In support of his position, the appellant argues that 20 Pa.C.S.A. § 3360(a) prescribes only two instances in which a court may intervene to consider subsequent offers made to a trustee; to-wit:

... first, where the transaction can only be accomplished with court approval, such as where the transaction is prohibited by the trust agreement, or second, where the parties "specifically provide for prior approval of the terms of sale." Because neither of these exceptions applies here, judicial intervention was not permissible in this case.

Appellant's Brief at 17–18. We disagree and begin our explanation of the same with Section 3360(a), which provides in pertinent part:

(a) Inadequacy of consideration or better offer.—When a personal representative shall make a contract not requiring approval of court, or when the court shall approve a contract of a personal representative requiring approval of the court, neither inadequacy of consideration, nor the receipt of an offer to deal on other terms shall, except as otherwise

2. The auction in open court resulted in the appellant being outbid by Mr. Stoecklein with an offer of 2 million dollars for the Trust's assets, accepted and finalized thereafter.

agreed by the parties, relieve the personal representative of the obligation to perform his contract or shall constitute ground for any court to set aside the contract, or to refuse to enforce it by specific performance or otherwise. Provided that this subsection shall not affect or change the inherent right of the court to set aside a contract for fraud, accident or mistake. Nothing in this subsection shall affect the liability of a personal representative for surcharge on the ground of negligence or bad faith in making a contract.

20 Pa.C.S.A. § 3360(a).

This Court has had occasion to apply Section 3360(a) to a scenario in which an Orphans' Court refused to approve the sale of real estate to a prospective buyer (North Fork, Inc.), even though an executor had petitioned for approval of the sale as required by the terms of the Agreement where a subsequent buyer (Stabler Development Corp.) had made a higher offer for the same property. See *In re Estate of Lazarus*, 420 Pa.Super. 379, 616 A.2d 1023 (1992), allocatur denied, 534 Pa. 649, 627 A.2d 179 (1993).

On appeal, in affirming the Orphans' Court, the *Lazarus* Court made some observations which are instructive as to the course to pursue at bar; to-wit:

... section 3360(a) deals specifically with only two situations: (1) when a personal representative shall make a contract not requiring court approval, or (2) when a court has already approved a contract of a personal representative requiring court approval. The present case falls under neither category. The contract between the Executor and North Fork, Inc., does not fall into category one since the contract did not require court approval. While the second category under that section does deal with contracts requiring court approval, as did the North Fork contract, when read carefully, and in its entirety, it is clear that the type of situation falling within the second category of section 3360(a) is most succinctly interpreted by our Supreme Court in *Estate of Penrose*, 486 Pa. 9, 403 A.2d 982 (1979).

\* \* \* \* \* \*

In addressing the possible applicability of section 3360(a) to the case before it, the *Penrose* court stated:

> Any suggestion that section 3360(a) of the Probate, Estates and Fiduciaries Code, 20 Pa.C.S.A. §§ 101 et seq., precluded the court's consideration of the [subsequently made] Keeley offer in determining whether to approve the R & R [initial] agreement is without legal or factual basis.
>
> . . . .

In [In re] *Curtis Estate,* supra, this court stated:

> The Act of May 24, 1945, P.L. 944, 20 P.S. §§ 818, 819 [*now section 3360* ], specifically addresses itself to situations in which it appears *after approval* that a higher price could have been obtained, and it forbids any withdrawal of approval for such a reason. Absent a showing of a lack of integrity in the judicial process which led to the approval, the approval, once given, is final and binding.

437 Pa. [123] at 129, 261 A.2d [589] at 593 [ (1970) ]. Here prior to court approval and before execution of the R & R agreement another offer arose. That offer was properly considered by the court in evaluating the best interests of the beneficiaries. *Estate of Penrose* at 14–15, n. 3, 403 a.2d at 984–85, n. 3 (emphasis added).

Presently, we also are faced with a situation where, *prior* to court approval, another offer was presented to the executor. Clearly, in light of *Penrose, supra,* and *Curtis, supra,* the trial court did not err in evaluating the offers in light of the best interests of the beneficiaries and granting its approval accordingly.

This interpretation of section 3360(a) becomes all the more cogent when one considers that, under established principles of contract law, the "court approval" clause in the sales agreement operates as a condition precedent.

\*  \*  \*  \*  \*  \*

... the North Fork sales agreement ... was conditional. The agreement provides that an event must occur; namely,

that the Orphans' Court approve the agreement before any contractual duties arise. Furthermore, although this event must occur, it is not certain to occur. Court approval of the agreement is not *pro forma.* A key characteristic of a conditional contract is that the condition is not certain to occur. * * * Section 3360(a) specifically provides that a better offer will not "constitute ground[s] for any court to set aside *the contract."* Until the condition precedent is satisfied, no contractual duties arise. Thus, when presented with two conditional sales agreements, the trial court is well within its power to evaluate the agreements and grant its approval of one or the other. It is only when, *after* initial approval of the court has been granted, that section 3360(a) would come into play to prevent the court from setting aside a contract it has already approved.

420 Pa.Super. at 384–86, 616 A.2d at 1025–1026.

Instantly, as in *Lazarus,* the Sales Agreement provided specifically for court approval as a *sine qua non* to consummating the sale between the trustees and the appellant:

> ... in order to satisfy conditions and restrictions of the Trust Agreement, Sellers[/Trustees] will seek court approval for leave to consummate the sale of the assets to [the appellant] in accordance with the petition for leave to make public or private sale.... After Sellers[/Trustees] obtain the final order of court requested in the petition, Sellers[/Trustees] shall notify Buyer of receipt of the order....

See Exhibit "A", attached to Orphans' Court's May 12, 1994, order at Record No. 28 ("Article 5.1—Miscellaneous"). Also, with the conditional nature of the Sales Agreement, the Orphans' Court had the authority to open the bidding process by holding an auction in court to allow for the most lucrative return for the beneficiary (Ms. Samson) of the trustees' sale of trust assets. See note 2, supra.

To embrace the appellant's contention that the trustees only requested by petition that the Orphans' Court rule that the "geographic" clause of proscribing sales to Allegheny County residents or corporations doing business in the same county did not apply to the appellant ignores record evidence to the

contrary. For instance, in the "Petition For Leave To Consummate Sale" at Paragraph 9, it provided that the sale of real estate had been discussed "with four national entities ... and with numerous entities in southwestern Pennsylvania ... interested in real estate development." Interested entities were advised on June 30, 1993, to submit sealed bids and "that all proposals would be subject to the approval of ... Trust Investment committee, that the *Petitioners expected to seek court approval of the sale....*" (Emphasis added).

In Paragraph 20 of the "Petition to Consummate," the petitioners wanted to complete the sale, but they believed that Article Five (A) "may limit their power" to sell to the appellant because of his activities in Allegheny County individually and as an owner of stock in corporations which conducted business in Allegheny County. "For this reason Petitioners wish[ed] to insure that the limitation on their power to sell [wa]s removed and therefore *s[ought] court approval of the proposed sale* in accordance with Section 7141, 3351, 7133 & 3353 of the Pennsylvania Probate, Estates and Fiduciaries Code." See Record No. 7, page 5.

Lastly, Paragraph 12 of the "Petition to Consummate" read that all those interested parties making inquiry into the purchase of property, "in each case ... have [been] notified ... that *the proposed sale is subject to court approval* and ... if they have any interest in the proceeding, they should contact the Clerk of the Orphans' Court Division for further information." *Id.* at page 6 (Emphasis added).

Accordingly, viewed in light of the language contained in the "Insurance Trust Agreement," "Sales Agreement" and "Petition For Leave To Consummate Sale," the trustees were not seeking *solely* to invalidate the "geographic" clause of the Trust Agreement, but to obtain the Orphans' Court's imprimatur for the sale and to insulate the fiduciaries from any possible surcharge for acting improvidently or *ultra vires.* This is evident from the fact that the trustees received inquiries "nationally" from prospective buyers, and the sale drew more than the appellant's interest. Thus, regardless to whom the trustees sold, court approval would have been necessary in

advance of consummating any agreement with a prospective buyer, be he/she within or outside the confines of Allegheny County. Paragraphs 9, 10 and 12 of the Sales Agreement indicate no less. See discussion supra.

The appellant having proffered no argument supportive of his request for a reversal of the Orphans' Court's actions, we affirm the order appealed. See *Lazarus,* supra, 420 Pa.Super. 379, 616 A.2d 1023.

Order affirmed.[3]